Jill **SIKKELEE**, individually and as, Personal Representative of the estate of David Sikkelee, deceased, Plaintiff,

v.

**PRECISION AIRMOTIVE, CORPORATION, et al., Defendants.**

No. 4:07–cv–00886.

United States District Court, M.D. Pennsylvania.

July 3, 2012.

Clifford A. Rieders, Rieders Travis Humphrey Harris Waters & Waffenschmidt, Williamsport, PA, David I. Katzman, John D. McClune, Patrick J. Gallagher, Katzman Lampert & McClune, Troy, MI, for Plaintiff.

John M. Devaney, Perkins Cole LLP, Washington, DC, Mary P. Gaston, Sara E. Baynard–Cooke, Perkins Coie, Seattle, WA, William J. Conroy, William A. Rubert, Campbell Campbell Edwards & Conroy, P.C., Wayne, PA, Catherine B. Slavin, Sara A. Frey, Cozen O'Conner, John E. Salmon, Zachary J. Ballard, Salmon, Ricchezza, Singer & Turchi, LLP, Philadelphia, PA, for Defendants.

**MEMORANDUM & ORDER**

JOHN E. JONES III, District Judge.

Presently pending before the Court in this wrongful death and survival action is the Motion for Partial Summary Judgment (Doc. 220) and the Motion for Summary Judgment (Doc. 252) of Defendant AVCO Corporation on behalf of its Lycoming Engines Division (collectively "Lycoming"). The Motions have been fully briefed (Docs. 223, 235, 249, 257, 269, 276, 292, 296) and are therefore ripe for our review. For all of the reasons fully articulated herein, we will grant in part and deny in part Lycoming's Motions.

## I. PROCEDURAL HISTORY

The parties and the Court are intimately familiar with the lengthy and complex procedural and factual predicate of this litigation and we thus recite only the most pertinent procedural points here. Plaintiff initiated this action on May 16, 2007 with the filing of a Complaint that asserted claims for strict liability, negligence, breach of warranty, concert of action, and misrepresentation against seventeen different Defendants[1] arising out of an aircraft accident that resulted in the death of her husband, David Sikkelee ("the decedent"). (Doc. 1). The Defendants filed individual answers to the Plaintiff's Complaint between July 25 and August 1, 2007. (Docs. 52–57).

Several Defendants filed, or eventually joined in, a Motion for Judgment on the Pleadings on March 17, 2009. (Doc. 107). We granted in part and denied in part said motion after finding that the field of aviation safety is preempted by federal law and regulation. We thus dismissed Plaintiff's claims which were based on alleged

---

1. The Complaint places the seventeen Defendants into three different groups: the Precision Defendants, the Kelly Defendants, and the Lycoming Defendants. The Precision Defendants include: Precision Airmotive, LLC; Precision Airmotive Corporation; Precision Aerospace Corporation; Precision Aerospace Services f/k/a Precision Aerospace Group, LLC; Precision Aviation Products Corporation and Precision Products, LLC; Former Fuel Systems, Inc. f/k/a Facet Fuel Systems, Inc.; and Mark IV Industries, Inc. The Kelly Defendants include: Kelly Aerospace, Inc., Kelly Aerospace Power Systems, Inc., Consolidated Fuel Systems, Inc., and Electrosystems, Inc., which merged with Consolidated Fuel Systems, Inc. The Lycoming Defendants include: Textron, Inc.; AVCO Corporation; and Textron Lycoming Reciprocating Engine Division, a division of AVCO Corporation.

violations of state law standards of care but permitted the Plaintiff to seek state law remedies for alleged violations of federal standards of care. (Doc. 158). The Court directed the Plaintiff to file an Amended Complaint within twenty (20) days. (Id.).

On August 31, 2010, within the prescribed twenty (20) day period, Plaintiff filed her First Amended Complaint. On September 17, 2010, Defendants AVCO and Lycoming Engines filed a Motion to Dismiss and/or Strike, (Doc. 165), Defendant Textron filed a Motion to Dismiss, (Doc. 166), and Defendants Precision Airmotive Corporation and Precision Airmotive LLC filed a Motion to Dismiss and/or Strike. (Doc. 167). On October 15, 2010, the Kelly Defendants filed their Motion to Dismiss. (Doc. 175).

On April 8, 2011, 2011 WL 1344635, the Court entered a Memorandum and Order granting in part and denying in part the above motions.[2] The Court denied Lycoming's Motion to the extent it related to Counts IV (strict liability) and VI (negligence), but granted it to the extent it related to Counts V (breach of warranties), X (misrepresentation) and XI (concert of action). We further ordered Plaintiff to file a second amended complaint within ten (10) days in accordance with our decision. (Doc. 204). Plaintiff filed the Second Amended Complaint within the prescribed ten (10) day period, (Doc. 205), and the Defendants answered on May 5, 2011. (Docs. 206–208).

On July 22, 2011, Lycoming filed a Motion for Determination of Applicable Law, (Doc. 219), seeking application of North Carolina law to all matters concerning liability in this litigation. On August 5, 2011, Lycoming filed the instant Motion for Partial Summary Judgment, seeking summary judgment on Count IV and Count VI to the extent that those causes of action relate to alleged defects in certain carburetor replacement components. (Doc. 220). On October 3, 2011, Lycoming filed a Motion for Summary Judgment on the remainder of the claims in Count IV and Count VI relating to alleged defects in the subject aircraft engine. (Doc. 252).

On October 14, 2011, Plaintiff filed a Motion to Supplement the Record with several recently-discovered AVCO admissions. (Doc. 256). By Order dated December 21, 2011, the Court granted the Motion to Supplement. (Doc. 279). Consistent with the Order's mandate, on January 10, 2012, the Plaintiff filed a supplemental statement of facts (Doc. 280), and on February 3, 2012, Lycoming filed a responsive statement of facts. (Doc. 284).

On March 13, 2012, the Court ruled on Lycoming's Motion to Determine Applicable Law and concluded that Pennsylvania law will apply to the liability portion of this action. (Doc. 288). In the Memorandum and Order denying the Motion, the Court noted that Lycoming had relied considerably on the application of North Carolina law in its Motions for Summary Judgment and thus granted the parties leave to supplement their briefs in light of

2. Throughout the pendency of the litigation and the above-noted motion practice, all Defendants, with the exception of Defendant AVCO, on behalf of Defendant Lycoming Engines, have been terminated from the action. On July 13, 2010, the Court approved a settlement between Plaintiff and the Kelly Defendants. (Doc. 146). Defendant Textron was terminated from the action on November 2, 2010, pursuant to a Stipulation of Dismissal. (Doc. 184). Defendants Precision Aerospace Corporation, Precision Aerospace Services, LLC, Precision Aviation Products Corporation, Precision Products LLC, Zenith Fuel Systems LLC, Former Fuel Systems, Inc., and Mark IV Industries, Inc., were terminated on April 20, 2011.

this determination. (*Id.*). On April 20, 2012, Lycoming filed supplemental briefs in support of its Motions (Docs. 292–93), and Plaintiff filed a brief in opposition on May 21, 2012. (Doc. 296). Both Motions have now been fully and excellently briefed by the parties and are thus ripe for our review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed.R.Civ.P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations of denials in its own pleadings; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.,* 214 F.3d 402, 407 (3d Cir.2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey,* 772 F.2d 1103, 1109–10 (3d Cir.1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *P.N. v. Clementon Bd. of Educ.,* 442 F.3d 848, 852 (3d Cir.2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw therefrom. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be a *genuine* issue of *material* fact to preclude summary judgment." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505.

## III. STATEMENT OF MATERIAL FACTS.

The following facts are derived from the record and viewed in the light most favorable to the Plaintiff in accordance with the standard of review applicable to a motion for summary judgment. Due to the factual complexity of this litigation and the familiarity of the parties and the Court with the record, we briefly state the pertinent facts herein and supplement them as necessary with additional facts throughout our analysis.

This action arises out of an aircraft accident involving a 1976 Cessna 172N airplane on July 10, 2005 at the Transylvania County Airport in Brevard, North Carolina. The accident resulted in the death of David Sikkelee ("the decedent"), hus-

band of Jill Sikkelee ("Plaintiff"), and significant injuries to the decedent's brother, Craig Sikkelee ("the passenger"). Shortly after takeoff on July 10, 2005, the plane crashed to the ground, resulting in the death of the decedent and serious injuries to the passenger. Plaintiff alleges that the accident was caused by a faulty carburetor, specifically a loosening throttle body to bowl assembly within said carburetor, installed in the subject engine.

Lycoming designed and manufactured a certain 0–320–D2C aircraft engine, bearing serial number L–6590–39A ("engine S/N L–6590–39A" or "the subject engine"), in Williamsport, Pennsylvania. (Doc. 253, ¶ 1). Lycoming shipped the subject engine to Beagle Aircraft, Inc., on September 4, 1969. (Id. ¶ 2). The Lycoming O–320 engine, S/N L–6590–39A, was installed on the Cessna 172N aircraft when it crashed on July 10, 2005. (Id. ¶ 3). Plaintiff admits that the carburetor that was installed on the Cessna 172N was not the same carburetor Lycoming shipped with the subject engine in 1969 but was instead a different carburetor. (Doc. 221, ¶ 5). The carburetor installed in the subject engine on the accident aircraft ("replacement carburetor"), a Precision MA–4SPA carburetor, was manufactured by the Precision Defendants and was completely overhauled by the Kelly Defendants on or about August 3–5, 2004. (Id. ¶ 6; Doc. 253, ¶ 5).

Lycoming holds the FAA-issued Type Certificate for the MA–4SPA model carburetors and the MA–4SPA carburetor at issue here was manufactured pursuant to Lycoming design, which cannot be modified or altered without approval from Lycoming (Doc. 234, ¶ 5). Defendant Precision and its predecessors were permitted to manufacture the carburetor pursuant to a licensing agreement with Lycoming. (Id.). The MA–4SPA carburetor design is not approved separately and is part of the Lycoming engine type design. (Id.).

As the holder of the Type Certificate for the engine, Lycoming approved and implemented the engineering change which effected the throttle body to bowl screw design at issue here in lieu of a safety wire assembly. (Id. ¶ 5, 22). This change was made in 1965. (Id. ¶ 22). Since 1972, Lycoming has been made aware of various reports of malfunctions and defects related to its O–320 series engines and the MA–4SPA carburetors, specifically concerning loosening throttle body to bowl assemblies. (Id. ¶¶ 24–25).

The 2004 overhaul of the subject engine, including the overhaul of the carburetor, was accomplished pursuant to and required by Lycoming's continued airworthiness instructions, which the FAA mandates Lycoming, as the Type Certificate holder for the entire engine design, maintain in compliance with federal aviation regulations. (Id. ¶¶ 5–6). The Kelly Defendants further complied with Lycoming's Service Bulletin 366, which was intended to alleviate the known throttle body to bowl assembly defects. (Id. ¶ 6). Lycoming's continued airworthiness instructions recommend that the carburetor be replaced at the time of the engine overhaul, and its Type Certificate Data Sheet ("TCDS") instructs mechanics to use MA–4SPA replacement carburetors when overhauling this engine. (Id.). Accordingly, as required by Lycoming's design, an MA–4SPA carburetor was installed on the subject engine during the 2004 overhaul.

The replacement carburetor on the subject engine at the time of the crash was a Lycoming-approved Marvel Schebler MA–4SPA model 10–5135 carburetor, which bore Lycoming part number, LW–13659. (Id.). Plaintiff's three experts conclude that the carburetor design was and is defective and dangerous. (Docs. 234–4, 234–

5, 234–6). Donald E. Sommer, P.E., an expert who investigated the subject engine subsequent to the crash, noted that the carburetor bowl screws had loosened in the subject engine; he conducted several tests and concluded that "[t]he accident O–320 MA–4SPA carburetor is unreasonably dangerous and caused the death of David Sikkelee." (Doc. 234–6, pp. 34). He ultimately concluded that Lycoming "failed to exercise reasonable care in the design, manufacture, and support of the accident aircraft's engine and carburetor" and that Lycoming's O–320–D2C engine "is a defective engine due to the incorporation of the Precision MA–4SPA carburetor." (*Id.*)

## IV. DISCUSSION

As stated above, the only remaining causes of action sound in negligence and strict liability. As a threshold matter, Lycoming contends that both of these claims fail because the Plaintiff is unable to establish that Lycoming either manufactured, sold, or distributed a defective product. We first address this critical preliminary issue and, because we find that a reasonable jury could conclude that Lycoming was a *de facto* manufacturer of a defective product, proceed next to analyzing the remaining elements of the Plaintiff's negligence and strict liability claims.

### A. Is There a Genuine Issue as to Whether Lycoming Manufactured, Distributed, or Sold an Allegedly Defective Product?

Under both of the Plaintiff's remaining causes of action, her burden of proof requires that she establish that Lycoming is a manufacturer, distributor, or seller of the allegedly offending product. *See Mellon v. Barre–Nat'l Drug Co.*, 431 Pa.Super. 175, 636 A.2d 187, 191 (1993) (in a negligence-based products liability action, the "defendant must be identified as the manufactur-er, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant"); *Kimco Dev. Corp. v. Michael D's Carpet Outlets*, 536 Pa. 1, 637 A.2d 603, 606 (1993) ("Strict product liability is premised on the concept of enterprise liability for casting a defective product into the stream of commerce."). Thus, as a threshold matter, we must address the parties' arguments with respect to whether or not Lycoming cast a defective product into the market.

Lycoming contends that it is entitled to summary judgment because, while it admittedly sold the subject engine in 1969, the allegedly defective replacement parts installed during the engine's overhaul in 2004 were manufactured and sold by others, thus failing the preliminary requirement of a Pennsylvania products liability action. Indeed, Lycoming submits that its last physical "contact" with the product was in 1969. Lycoming asserts that the evidence is entirely "one-sided" and establishes that it did not manufacture, sell, distribute, or otherwise "place[ ] an allegedly defective product into the stream of commerce," thus requiring entry of summary judgment in its favor on both of Plaintiff's remaining claims. (Doc. 249, pp. 10–11). Indeed, Lycoming submits that the facts are *undisputed* that it did not manufacture, distribute, sell, or otherwise cast into the stream of commerce the allegedly defective replacement carburetor and its component parts.

In support of this argument, Lycoming points to the following facts: that it manufactured the subject engine, S/N L–6590–39A, in 1969 (Doc. 253, ¶ 1); that said engine was installed on the subject Cessna 172N aircraft when it crashed on July 10, 2005 (*Id.* ¶ 3); that the carburetor installed at the time of the 2005 crash was not the

same carburetor shipped with its S/N L–6590–39A engine in 1969 (*Id.* ¶ 5); that the carburetor installed at the time of the crash was in fact a replacement carburetor, a Precision MA–4SPA (*Id.* ¶ 5); that the replacement carburetor was completely rebuilt or overhauled by the Kelly Defendants in 2004, which installed new or as new parts and components with the carburetor (*Id.*); and that the Kelly Defendants manufactured the carburetor's replacement component parts, rebuilt or overhauled the replacement carburetor, and shipped the replacement carburetor. (*Id.* ¶ 6).

■ In sum, Lycoming contends, and Plaintiff does not dispute, that the Kelly Defendants manufactured, replaced, and shipped the carburetor and its component parts. (Docs. 221, ¶¶ 7–17). Lycoming asserts that its last physical contact with the product was in September of 1969 when it was shipped and placed in long-term storage and that Plaintiff has failed to prove that a defect existed at that time. On this point, we agree with Plaintiff, and will grant summary judgment to the limited extent that Plaintiff's claims may be construed to allege a defect in the engine in 1969. Plaintiff has offered no evidence, expert or otherwise, demonstrating that the engine was defective when it left the Lycoming's Williamsport manufacturing plant in 1969 or that a defect existing at that time caused the 2005 aircraft accident.

■ However, while Plaintiff does not contest Lycoming's factual recitation thus far, she does disagree with its ultimate legal conclusion—that Lycoming cannot possibly be deemed a manufacturer, seller, or distributor subject to liability for injuries purportedly caused by the allegedly defective carburetor in light of Defendant Precision's manufacture and the Kelly Defendant's overhaul of said product. As she must to satisfy her burden at the summary judgment level, Plaintiff points to several substantial facts of record which Lycoming omits in making its arguments seeking summary disposition of both claims and submits to the Court that they sufficiently support her claims and warrant submission of the case to a jury.

Specifically, Plaintiff points to the following: that the replacement carburetor on the subject engine at the time of the crash was a Lycoming-approved Marvel Schebler MA–4SPA model 10–5135 carburetor (Doc. 234, ¶ 5); that the MA–4SPA carburetor was manufactured by Defendant Precision and its predecessors pursuant to a licensing agreement with Lycoming (*Id.*); that MA–4SPA carburetors are assigned a Lycoming part number, LW–13659 (*Id.*); that Lycoming holds the FAA Type Certificate for the MA–4SPA model carburetors and that the MA–4SPA carburetor at issue here was manufactured pursuant to Lycoming design drawings, which cannot be modified or altered without approval from Lycoming (*Id.*); that Lycoming approved the allegedly defective throttle body to bowl screw design at issue here (*Id.*); that the subject engine and carburetor were overhauled in 2004 pursuant to Lycoming's manual and Service Bulletin 366 (*Id.* ¶ 6); that Lycoming, in its continued airworthiness instructions, recommends that MA–4SPA carburetors be replaced when an engine is serviced or overhauled (*Id.*); and that Lycoming's Type Certificate Data Sheet ("TCDS") instructs mechanics to use MA–4SPA replacement carburetors when overhauling this engine. (*Id.*).[3]

**3.** Likewise compelling language is found in a 1972 letter the FAA provided to Lycoming with reports of malfunctions within its Marvel Schebler carburetor designs. That letter notes the following: "Marvel Schebler carburetors are a part of the engine type design and

Our understanding of Plaintiff's argument, then, is not that Lycoming was the physical manufacturer of the allegedly defective carburetor; indeed, Plaintiff admits that Lycoming's hands did not physically touch the carburetor. (*See* Doc. 234, ¶¶ 7–17). Instead, the argument appears to be that the 2004 overhaul of the engine itself, admittedly physically accomplished by others but pursuant to the strict requirements and direction of Lycoming's manuals and service bulletins, was, in essence, a Lycoming-controlled remanufacture of the engine and its component parts. Thus, it follows that because Lycoming exercised such control over the MA–4SPA carburetor and the engine overhaul in its entirety, Plaintiff's argument would conclude that Lycoming can fairly be said to be a *de facto* manufacturer of the overhauled engine, rendered defective by the replacement carburetor installed pursuant to its direction.[4]

Lycoming's argument, at first blush, appears sound. A tunnel vision approach to this case—considering Lycoming's limited factual summary—indeed would likely conclude that Lycoming is not possibly a "manufacturer, distributor, or seller." *See Mellon*, 636 A.2d at 191 (negligence product liability); *Kimco Dev. Corp.*, 637 A.2d at 606 (strict product liability). However, Lycoming neglects critical facts regarding its role in the manufacture of the replacement carburetor and the overhaul of the engine; indeed, a reading of Lycoming's papers would could convince a layperson that Lycoming effectively washed its hands of the subject engine in 1969 and has had no control over it since. Review of the record as a whole, however, demonstrates that this is not necessarily the case, and that Plaintiff has created genuine issues of material fact with respect to whether Lycoming is indeed a manufacturer of the defective engine following its 2004 overhaul.

In this Court's opinion, it would entirely defy concepts of fairness and justice and run counter to the considered history of products liability policy to hold that a Type Certificate holder who exclusively controls the design and manufacture of replacement component parts and mandates the installation of said parts during an overhaul of its engine could escape liability for a defect in a component part simply because it is not physically involved in the manufacture and installation process. Indeed, in our opinion, sufficient evidence has been submitted from which a reasonable jury could find that, while Lycoming's hands were not physically present in the plant during the manufacture or in the shop during the overhaul, its invisible

---

are not approved separately. The type certificate holder is responsible for the type design and also the correction of service problems. Marvel Schebler manufactures carburetors under PMA procedures, but this is based on a licensing agreement with the engine manufacturers ... Service problems which may be design-related should be referred to the engine manufacturer for corrective action." (Doc. 234-13). This language supports Plaintiff's contention a reasonable trier of fact could conclude that Lycoming is, for purposes of products liability, the designer of a defective product.

**4.** Relatedly, Plaintiff contends that Lycoming's continued airworthiness instructions, which specifically require the defective throttle body to bowl screws and lock tab washers, and which Defendant Kelly was required to follow in overhauling the engine, are also defective and independently support a products liability action. Based upon our analysis herein, we find that the instructions themselves, including Lycoming's overhaul manuals, continued airworthiness instructions, and service bulletins, are part of the design defect itself which led to the ultimate "manufacture" of the defective engine upon its overhaul in 2004. Accordingly, we find it unnecessary to distinguish between the instructions and the product as the ultimate design defect is a culmination of the two.

hands were undeniably present as it was Lycoming's design directive which caused the allegedly defective carburetor to be produced and placed in the engine, ultimately leading to the 2005 crash.

In an instructive and factually similar case, the Pennsylvania Supreme Court held that "the status of type certificate holder and/or designer fall under the umbrella of manufacturer for purposes of GARA." *See Pridgen v. Parker Hannifin Corp. (Pridgen I),* 588 Pa.405, 905 A.2d 422, 436 (2006). In *Pridgen,* the court was addressing issues of GARA repose and not questions of liability as here, but the court's opinion nonetheless aids our conclusion that a Type Certificate holder who knows of an alleged defect and knowingly fails to inform the FAA and ultimate consumer should not be relieved of liability merely because it was not the physical manufacturer of the replacement carburetor. Indeed, the court implied as much in affirming its decision on rehearing, stating that "in the absence of GARA repose, [Lycoming] might indeed be liable for design defects in a replacement [carburetor] and/or the aircraft systems within which such components function." *Pridgen v. Parker Hannifin Corp. (Pridgen II),* 974 A.2d 1166, 1172 (Pa.Super.Ct.2009).

Finally, we would be remiss to turn a blind eye to the public policy rationales which support products liability causes of action. Products liability actions grew out of the need to protect the public from harms most appropriately borne by the manufacturer and to apportion the burden of compensating for that harm to the party most able to bear the loss which, in the great majority of cases, is the negligent manufacturer. *See, e.g., Polius v. Clark Equipment Co.,* 802 F.2d 75, 76–77 (3d Cir.1986) ("[T]he public policy underlying strict products liability ... is to protect the injured party by placing the burden on the party most able to bear the loss by spreading the risk.").

A consideration of this public policy ultimately undermines Lycoming's argument and highlights our conclusion that an injustice would be accomplished by permitting a company such as Lycoming to exercise so much control over the manufacturing process while at the same time immunizing itself from liability for defects resulting from its process. Lycoming does not deny that it designed the MA–4SPA carburetor, that its design must be complied with by the manufacturer to which it granted the design license, that the overhauling mechanic must comply with its design, or that the 2004 overhaul of its engine, including manufacture and installation of an MA–4SPA carburetor allegedly known to have been defective, was in fact accomplished pursuant to its binding designs and mandatory directives.

Ultimately, we agree with Sikkelee that questions of fact abound regarding whether or not Lycoming was the manufacturer of the overhauled engine in 2004. Indeed, to hold otherwise would be to immunize Lycoming from liability arising from defects within its own design. This Court declines to permit Lycoming to shift liability for a defective engine to its physical component part manufacturers and overhauling mechanics simply by physically removing itself from the overhaul process even though its directives control every aspect of said process. Such a decision would fly in the face of justice and defeat the long-established purposes of products liability actions. It is clear to this Court that the record contains ample evidence from which a reasonable finder of fact could conclude that Lycoming is, in essence, a *de facto* manufacturer of the allegedly defective engine upon its 2004 overhaul, subjecting it to products liability under Pennsylvania law.

Accordingly, we find that a genuine issue of material fact exists with regard to whether Lycoming is a manufacturer of the subject engine, allegedly rendered defective in 2004 upon the installation of a carburetor that Lycoming designed and required to be installed in the subject engine.

## B. Strict Liability

■ Our inquiry does not end with the determination that a reasonable jury could find that Lycoming is a manufacturer with regard to the 2004 engine overhaul. Strict liability also requires a showing that the product was defective and that the defect was the proximate cause of the plaintiff's injuries. However, as exemplified by the parties fervid briefing of the issue, the parameters of the strict liability requirements in Pennsylvania have, for some time, been in a state of flux.

As Lycoming correctly observes, the Third Circuit has twice predicted that the Pennsylvania Supreme Court, when presented with the opportunity to do so, will adopt the Restatement (Third) of Torts ("Restatement Third") to supplant the Restatement (Second) of Torts ("Restatement Second"). *See Covell v. Bell Sports, Inc.*, 651 F.3d 357, 359 (3d Cir.2011); *Berrier v. Simplicity Mfg. Inc.*, 563 F.3d 38, 46 (3d Cir.2009). Lycoming thus asserts that pursuant to both *Berrier* and *Covell*, the Plaintiff's strict products liability claim is governed by the Restatement Third. An abbreviated analysis of the intervening case law leads the Court to a different conclusion.

In *Bugosh v. I.U. North Am., Inc.*, 596 Pa. 265, 942 A.2d 897 (2008), the Supreme Court of Pennsylvania certified for appeal the question of "[w]hether this Court should apply § 2 of the Restatement (Third) of Torts in place of § 402A of the Restatement (Second) of Torts." *Id.*

While that appeal was pending, the Third Circuit in *Berrier* was tasked with predicting how Pennsylvania's highest court would answer this question. The Circuit concluded, after extensive analysis of Pennsylvania law, that the state court would likely adopt the Restatement Third when presented with the opportunity to do so. *Berrier*, 563 F.3d at 46.

Shortly after *Berrier* was decided, the Supreme Court of Pennsylvania, after extensive argument, dismissed the *Bugosh* appeal as improvidently granted; it thus did not decide whether the Restatement Third should definitively become the governing law in Pennsylvania. Not long thereafter, this Court was presented with the question of whether the Restatement Third or Restatement Second should be applied in a diversity action governed by Pennsylvania law in light of the *Berrier* and *Bugosh* actions. In *Milesco v. Norfolk S. Corp.*, 2010 WL 55331, 2010 U.S. Dist. LEXIS 780 (M.D.Pa. Jan. 5, 2010), this Court held that "the Pennsylvania Supreme Court's dismissal of *Bugosh* was a clear indication that it intends for the Second [Restatement] to apply in the Commonwealth for the time being." *Id.* at 3, 2010 U.S. Dist. LEXIS 780 at 9–10; *see also Durkot v. Tesco Equip., LLC*, 654 F.Supp.2d 295, 297 (E.D.Pa. Sept.9, 2009) (concluding that the court's dismissal of the *Bugosh* appeal was an affirmative declination of the Restatement Third).

As we made clear in our decision in *Milesco* in addressing the conflicting interpretations of the *Bugosh* and *Berrier* interplay, the Third Circuit's prediction in *Covell* is binding upon federal district courts sitting in diversity absent an affirmative indication from the Pennsylvania Supreme Court that it intends to retain the Restatement Second as the law in Pennsylvania. In our opinion, this indication was provided in *Beard v. Johnson &*

*Johnson, Inc.,* 41 A.3d 823 (Pa.2012), where the Pennsylvania Supreme Court expressly took notice of "the continuing state of disrepair in the arena of Pennsylvania strict-liability" law and nonetheless declined to take the opportunity to replace the Restatement Second with the Restatement Third. *Id.* at 836.[5]

Consistent with our rationale in *Milesco,* we believe that the Pennsylvania Supreme Court, by again declining to take advantage of the opportunity to adopt the Restatement Third, has indicated that the Restatement Second remains the law in Pennsylvania. Indeed, Justice Baer, in a concurring opinion, expressly observed the same, stating that "the current law of Pennsylvania ... is Section 402A of the Restatement Second." *Id.* at 839 (Baer, J., concurring). Accordingly, we will apply the dictates of the Restatement Second in resolving the strict products liability questions in this action.

■■ In Pennsylvania, a manufacturer "is effectively the guarantor of his products' safety." *Salvador v. Atlantic Boiler Co.,* 457 Pa. 24, 319 A.2d 903, 907 (1974). The Restatement Second subjects to liability anyone "who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property ... for physical harm thereby caused to the ultimate user or consumer ... if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) of Torts § 402A.

■■ Under Pennsylvania's interpretation of the Restatement Second, "the jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020, 1022 (1978). Defective conditions give rise to three types of strict products liability claims: (1) manufacturing defects, (2) design defects, and (3) warning defects. *See French v. Commonwealth Assocs.,* 980 A.2d 623, 632 (Pa.Super.Ct.2009). Plaintiff's papers are suffused with allegations of negligence, strict liability, and defects, however her actual allegations are less than pellucid. It appears to the Court, however, that she is advancing both a design defect theory and a failure to warn theory. We address these claims *seriatim.*

### 1. Design Defect

In *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020 (1978), the Pennsylvania Supreme Court articulated the definition of a design defect within the context of then-recently adopted Section 402A. The court explained that "a manufacturer ... is effectively the guarantor of his product's safety" and stated that the "seller must provide with the product every element necessary to make it safe for use." *See id.* at 1026 (quoting *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 319 A.2d 903, 907 (1974); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893, 902 (1975)).

Lycoming first submits that Plaintiff cannot prevail on her design defect allegations because Lycoming did not manufacture the allegedly defective part. Having already determined that Lycoming might

---

**5.** Indeed, *Beard* makes it abundantly clear that there remains an ideological split within the Pennsylvania Supreme Court relative to adoption of the Restatement Third. The Third Circuit's prediction in *Covell* assumed the formation of a consensus that has not yet crystalized.

be subject to liability if the jury concludes that it was a manufacturer and designer of the carburetor and mandated its installation during the overhaul, we dismiss this contention. Lycoming also contends that the Plaintiff has failed to identify a defect in the engine design; it asserts that "[t]he only alleged design element related to the allegedly defective 'fuel metering system' [Plaintiff] identifies is that the engine was carbureted and not fuel injected." (Doc. 276, p. 7). Lycoming submits that utilizing a carburetion system instead of a fuel injection system does not support a design defect claim.

Lycoming's argument not only blatantly mischaracterizes Plaintiff's contentions, but also treads dangerously on the precipice of disingenuity. A review of the record and Plaintiff's submission clearly evidences that the Plaintiff's contention has continually been that the throttle body to bowl system incorporated in the carburetor renders the entire engine defective, that alternative options such as a safety wire would have been safer than the throttle body to bowl system, and that three experts have opined that the defect was not the mere fact of a carburetor system as opposed to a fuel-injected system, but the loosening of the throttle body to bowl assembly utilized by that carburetion system. Accordingly, Lycoming's only argument in this respect is without merit.

■ Plaintiff, on the other hand, provides abundant evidence to satisfy her burden at the summary judgment stage.

Plaintiff's experts have concluded that the defective throttle body to bowl assembly— installed pursuant to Lycoming's Type Certificate design for its O–320 engine— was the cause of the accident.[6] Richard H. McSwain, Ph.D., P.E., concludes that the "Lycoming LW–13659, Model MA–4SPA, carburetor has multiple failure modes that are related to design, materials selection, and construction that have the potential to cause in-service carburetor and engine malfunction" and that the throttle body to bowl assembly did in fact fail in the accident aircraft. (Doc. 234–4, ¶¶ 5.0, 6.10– .13). William R. Twa, Jr., in his report, recounts the lengthy history of the defect and concluded that the carburetor design and continued airworthiness instructions for overhauling the engine, including the mandated inclusion of a carburetor designed consistent with Lycoming's Type Certificate, are defective. (Doc. 234–5, p. 24).

Mr. Donald E. Sommer, P.E., also reviewed the history of the loosening throttle body to bowl assemblies. (Doc. 234–6, pp. 15–20). He investigated the subject engine after the crash and noted that the carburetor bowl screws were indeed loose. (*Id.*). After investigation, Mr. Sommer concluded that "[t]he accident O–320 MA–4SPA carburetor is unreasonably dangerous and caused the death of David Sikkelee," that Lycoming "failed to exercise reasonable care in the design, manufacture, and support of the accident aircraft's engine and carburetor," and that Lycoming's O–320–

---

**6.** In its brief in Brief in Support of Motion for Summary Judgment (Doc. 257), Lycoming contends that Plaintiff's expert reports consist entirely of legal conclusions and that their opinions are thus inadmissible. *See, e.g., Berckeley Inv. Grp. v. Colkitt,* 455 F.3d 195, 217 (3d Cir.2006). A review of the expert's submissions, however, indicates that this is not the case. The report of each of the Plaintiff's experts review the type certificate and

the design drawings of the MA–4SPA carburetor and the O–320 engines, specifically focusing on the safety of the throttle body to bowl assembly, and address whether or not the defective assembly was a proximate cause of the 2005 aircraft accident. (*See, e.g.,* Doc. 234–4, ¶¶ 5.0, 6.10–.13; Doc. 234–5, p. 24; Doc. 234–6, pp. 15–16, 34). We thus summarily reject this argument.

D2C engine "is a defective engine due to the incorporation of the Precision MA–4SPA carburetor." (*Id.* p. 34).

Lycoming has thus failed to present any law or evidence to this Court which requires summary dismissal of the Plaintiff's design defect claim. Plaintiff has established by expert and other evidence that a design defect existed which a jury could reasonably conclude was the proximate cause of the accident. Plaintiff has further demonstrated that alternative designs were feasible and contemplated but, ultimately, rejected by Lycoming in favor of the defective throttle body to bowl assembly herein at issue. Thus, as Plaintiff has overcome her burden and presented evidence which, viewed in a light most favorable to her, creates genuine issues of fact to be determined by a jury, we will deny summary judgment on the Plaintiff's design defect claims.

### 2. Failure to Warn

■ A manufacturer is subject to failure to warn liability where a product contains a defect and "was distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product." *Donoughe v. Lincoln Elec. Co.*, 936 A.2d 52, 61–62 (Pa.Super.Ct.2007). We have already stated above that the Plaintiff has presented enough evidence to support a finding that Lycoming's design was defective and a finding that said defective design was the proximate cause of the 2005 airplane crash. Thus, we must consider for this analysis only whether Lycoming failed to adequately warn of the defective carburetor installed within its engine pursuant to its mandate.

Lycoming again relies on its contention that it is not a "manufacturer" and thus fails to offer any evidence to disprove or dispute Plaintiff's allegation that it should have, and failed to, provide warnings regarding the defective carburetor design incorporated in its O–320 series engines advising potential users of the known dangers associated with the loosening throttle body to bowl assembly. Instead, Lycoming maintains only that it did not "manufacture" the product, an argument disposed of above.

■ Plaintiff cites to Lycoming's continuing airworthiness instructions and manual, void of any warning with respect to the defective carburetor design, as proof that Lycoming has failed to warn of a dangerous defect. Further, Plaintiff notes a complete lack of reports to the FAA regarding the various defects and malfunctions regarding the throttle body to bowl assembly. Without any argument or contradictory evidence presented by the Defendant to prove otherwise, ample evidence exists to put this issue to the jury. The evidence, viewed in a light most favorable to the Plaintiff, establishes a dearth of warnings from Lycoming with respect to an allegedly defective product, sufficient to survive summary judgment on her failure to warn claim.

### C. Negligence

As with the strict liability claim, our negligence analysis is not complete simply because genuine issues of material fact remain with respect to Lycoming's manufacturer status. Lycoming additionally contends that the Plaintiff has failed to establish the remaining elements of its negligence claim—that is, Lycoming asserts that Plaintiff has failed to submit evidence from which a jury could conclude that it breached an applicable standard of care and that said breach resulted in defects that proximately caused Plaintiff's injuries. (Doc. 276, pp. 7–9).

■ Lycoming states, correctly, that the Plaintiff's burden of proof on a strict liability negligence claim is to "show

that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003). In the products liability context, the duty of care arises where a reasonable jury might find that the defendant is a manufacturer, seller, or distributor of the allegedly defective product. *See Mellon*, 636 A.2d at 191. Here, we have concluded that the jury could reasonably attribute just such a duty to Lycoming in light of its control over the design, manufacture, and overhaul of the MA–4SPA carburetor and engine.

We have previously held that federal standards of care promulgated by the FAA apply in aviation cases such as this one and accordingly granted the Plaintiff leave to amend her negligence claims in order to fully state the federal standards which she believes control. *See Sikkelee v. Precision Airmotive Corp.*, 731 F.Supp.2d 429, 438 (M.D.Pa.2010). Plaintiff, in her Second Amended Complaint, asserts that Lycoming has breached copious federal standards in its promulgation of a defective design, mandated installation of the defective product, and failure to report the same, more specifically as follows:

— by not submitting truthful submissions to the FAA, including mandated reports of malfunctions and defects, in violation of 14 C.F.R. §§ 21.2, 21.3, 21.14, 21.21, 33.35, and 33.4;

— by incorporating design features or details which experience has shown to be hazardous or unreliability in violation of 14 C.F.R. § 33.15 and CAR § 13.100, 13.101, and by willfully concealing the same from the FAA in violation of mandatory reporting requirements

— knowingly designing or constructing an engine part which permits an unsafe condition of the engine between overhaul periods in violation of 14 C.F.R. § 33.19 and Civil Air Regulation ("CAR") § 13.104

— by designing and constructing a fuel supply system which did not ensure an appropriate mixture of fuel to the cylinders under all flight and atmospheric conditions in violation of 14 C.F.R. § 33.35 and CAR § 13.110

— by issuing continued airworthiness instructions which were defective as to the throttle body to bowl assembly for the MA–4SPA carburetor in violation of 14 C.F.R. § 33.4

— by holding the Type Certificate for a defective product and failing to report known malfunctions to the FAA regarding that defective product within twenty-four (24) hours after it discovered said malfunctions in violation of 14 C.F.R. §§ 21.3, 21.303;

— by operating as an FAA licensed and certified repair facility and failing to make known to the FAA the defect in the carburetor design within ninety-six (96) hours of discovery of the defect in violation of 14 C.F.R. § 145.221(a);

— and by knowingly misrepresenting and willfully concealing the defect in the throttle body to bowl screws and attachment problems to the FAA in violation of 14 C.F.R. § 21.3.

The Plaintiff contends that, as an entity causing a product to be cast into the stream of commerce, Lycoming had the duty to abide by the above regulations. The parties' briefs focus primarily on the issue of whether or not Lycoming is a

manufacturer, hence our detailed analysis of that issue and the parties respective positions above. Lycoming does not offer much argument with respect to the remaining elements of a negligence claim and we thus briefly engage in a largely independent analysis with respect to these elements.

■ To establish breach of the above standards, Plaintiff cites to the following facts: Lycoming approved the design change to the throttle body to bowl screw and assembly at issue while there were feasible design alternatives available (Doc. 268, ¶ 15); Lycoming required the defective throttle body to bowl screw and assembly at issue to be utilized by overhaulers such as the Kelly Defendants when overhauling the O–320 engine (*Id.* ¶ 17); Lycoming issued SB 366 in attempt to alleviate the problem of loosening throttle body to bowl screws on MA–4SPA carburetors in its O–320 engines (*Id.* ¶ 19; Doc. 234–10); and Lycoming did not report this known defect to the FAA (Doc. 268, ¶¶ 7–8). Further, Plaintiff's experts, including an aircraft certification consultant and licensed mechanical engineers involved in forensic engineering and aircraft accident reconstruction, concluded that the O–320 engine at issue in this case was rendered defective by the mandated inclusion of a carburetor known to be defective. (*Id.* ¶ 20 (citing Doc. 234–5, pp. 22–26; Doc. 234–6, p. 15)).

To prove that Lycoming was aware of the defect, Plaintiff points to two letters from Precision Airmotive to Mr. Rick Moffett at Lycoming on September 8, 2004 and November 8, 2004 advising Lycoming, as the Type Certificate holder for MA–4SPA carburetors, of loose throttle body to bowl issues related specifically to the Lycoming O–320 engine which had been occurring since Lycoming made the design change in 1965; the letter asked that Ly-

coming, as the Type Certificate holder, help research and alleviate the problem. (Doc. 268, ¶ 19 (quoting Doc. 234–14, pp. 3–4)). During his deposition, Mr. Moffett confirmed receipt of these letters; he stated that he may have forwarded the letter to the legal department, but took no other action. (*Id.* ¶ 22–23 (citing Doc. 234–7, pp. 74–75, 86–87)).

This evidence, viewed in the light most favorable to Plaintiff as it must be at this stage, creates a genuine issue of material fact with respect to Lycoming's alleged breach of federal standards of care governing it. A reasonable trier of fact could find from this evidence that Lycoming manufactured a defective product in violation of the FAA's regulations and that it was aware of the defect and failed to remedy it or notify the FAA as mandated by federal law.

■ Finally, we reach the question of causation. Based on the evidence presented to the Court by the Plaintiff, it is clear that questions of fact remain with respect to the issue ·of causation and that the question is thus undisputably within the province of the jury and not the Court. Plaintiff has provided ample evidence from which a reasonable trier of fact could conclude that the defective engine was the cause of the 2005 aircraft accident from which Plaintiff's injuries arose, most specifically, the following.

Plaintiff's experts have concluded that the defective throttle body to bowl assembly installed pursuant to Lycoming's instructions on Lycoming's O–320 engine was the cause of the accident. Richard H. McSwain, Ph.D., P.E., concludes in his report that the "Lycoming LW–13659, Model MA–4SPA, carburetor has multiple failure modes that are related to design, materials selection, and construction that have the potential to cause in-service carburetor and engine malfunction" and that the

throttle body to bowl assembly did in fact fail in the accident aircraft. (Doc. 234–4, ¶¶ 5.0, 6.10–.13). William R. Twa, Jr., in his report, detailed the lengthy history of the defect and concluded, among other things, that the design and continued airworthiness instructions for maintaining and overhauling the Lycoming LW–13659, MA–4SPA carburetor are defective. (Doc. 234–5, p. 24).

The report of Mr. Donald E. Sommer, P.E., is perhaps the most inculpative. Mr. Sommer reviewed the considerable history of the loosening throttle body to bowl assemblies and Lycoming's decades-long knowledge thereof. (Doc. 234–6, pp. 15–20). In addition, he investigated the subject engine and crash site, noting that the carburetor bowl screws were indeed loose at the time of the accident and concluding that "[t]he accident O–320 MA–4SPA carburetor is unreasonably dangerous and caused the death of David Sikkelee." (*Id.* pp. 15–20, 34). He further reports that Lycoming's continued airworthiness instructions for the carburetor were defective, that Lycoming "failed to exercise reasonable care in the design, manufacture, and support of the accident aircraft's engine and carburetor," and that the O–320–D2C engine "is a defective engine due to the incorporation of the Precision MA–4SPA carburetor." (*Id.*).

By presenting this evidence to the Court, the Plaintiff has created a genuine issue of material fact for the jury with respect to whether Lycoming breached the applicable federal standards of care by negligently designing a defective product that proximately caused the death of the Plaintiff's decedent and substantial injury to the Plaintiff's brother. Accordingly, we will deny Lycoming's Motion as it pertains to Plaintiff's negligence claim.

## V. CONCLUSION

For all of the reasons articulated above, we will grant Lycoming's Motions to the extent that they relate to the 1969 engine manufacture as the Plaintiff has failed to present any evidence which indicates that the engine as it left Lycoming's plant in 1969 was defective. All the same, for the reasons detailed at length above, the Court finds that genuine issues of material fact remain with regard to whether Lycoming is a manufacture relative to the defective carburetor and overhaul of the engine in 2004, whether a defect existed, and whether said defect proximately caused the Plaintiff's injuries. We will thus deny the Motions to the extent they relate to the 2004 overhaul of the subject engine.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Lycoming's Motion for Partial Summary Judgment (Doc. 220) and Motion for Summary Judgment (Doc. 252) are **GRANTED** to the extent that they seek judgment as a matter of law with respect to the condition of the engine in 1969.

2. Lycoming's Motion for Partial Summary Judgment (Doc. 220) and Motion for Summary Judgment (Doc. 252) are **DENIED** in all other respects. The case shall proceed on the negligence and strict liability design defect theories asserted by the Plaintiff as they relate to the 2004 engine overhaul.

3. The parties **SHALL FILE** a stipulation identifying new case management deadlines in accordance with the Court's calendar, as attached hereto, within twenty (20) days of today's date.

496

### Judge Jones
### 2012 Court Calendar

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre–Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | ~~7/29/11~~ | ~~9/1/11~~ | ~~12/1/11~~ | ~~1/4/12~~ |
| February | ~~8/31/11~~ | ~~10/3/11~~ | ~~1/3/12~~ | ~~2/2/12~~ |
| March | ~~9/30/11~~ | ~~11/1/11~~ | ~~2/1/12~~ | ~~3/2/12~~ |
| April | ~~10/31/11~~ | ~~12/1/11~~ | ~~3/1/12~~ | ~~4/3/12~~ |
| May | ~~11/30/11~~ | ~~1/2/12~~ | ~~4/2/12~~ | ~~5/2/12~~ |
| June | ~~12/30/11~~ | ~~2/1/12~~ | ~~5/1/12~~ | ~~6/4/12~~ |
| July | ~~1/31/12~~ | ~~3/1/12~~ | ~~6/1/12~~ | ~~7/5/12~~ |
| August | ~~2/29/12~~ | ~~4/2/12~~ | ~~7/2/12~~ | ~~8/2/12~~ |
| September | ~~3/30/12~~ | ~~5/1/12~~ | 8/1/12 | 9/5/12 |
| October | ~~4/30/12~~ | ~~6/1/12~~ | 9/4/12 | 10/2/12 |
| November | ~~5/31/12~~ | ~~7/2/12~~ | 10/1/12 | 11/2/12 |
| December | ~~6/29/12~~ | ~~8/1/12~~ | 11/1/12 | 12/5/12 |

**Case Management Conferences:**

| | |
|---|---|
| 1/31/12 | 7/31/12 |
| 2/28/12 | 8/31/12 |
| 3/30/12 | 9/28/12 |
| 4/30/12 | 10/31/12 |
| 5/30/12 | 11/30/12 |
| 6/29/12 | 12/31/12 |

### Judge Jones
### 2013 Court Calendar

| Trial List | Discovery Cut-off | Dispositive Motions Cut-off | Final Pre–Trial Conferences | Jury Selection |
|---|---|---|---|---|
| January | 7/30/12 | 9/3/12 | 12/3/12 | 1/3/13 |
| February | 8/31/12 | 10/1/12 | 1/2/13 | 2/4/13 |
| March | 9/28/12 | 11/1/12 | 2/1/13 | 3/4/13 |
| April | 10/31/12 | 12/3/12 | 3/1/13 | 4/2/13 |
| May | 11/30/12 | 1/1/13 | 4/1/13 | 5/2/13 |
| June | 12/31/12 | 2/1/13 | 5/1/13 | 6/4/13 |
| July | 1/31/13 | 3/1/13 | 6/3/13 | 7/2/13 |
| August | 2/28/13 | 4/1/13 | 7/1/13 | 8/2/13 |
| September | 3/29/13 | 5/1/13 | 8/1/13 | 9/4/13 |
| October | 4/30/13 | 6/3/13 | 9/3/13 | 10/2/13 |
| November | 5/31/13 | 7/1/13 | 10/1/13 | 11/4/13 |
| December | 6/28/13 | 8/1/13 | 11/1/13 | 12/3/13 |

**Case Management Conferences:**

| | |
|---|---|
| 1/30/13 | 8/30/13 |
| 2/27/13 | 9/30/13 |
| 3/27/13 | 10/30/13 |
| 4/30/13 | 11/27/13 |
| 5/31/13 | 12/30/13 |
| 6/28/13 | |
| 7/31/13 | |